FELIX W. ROBERTSON, JR., *v.* THE STATE.

1. BURGLARY. — The indictment charged burglary, and also theft after the burglarious entry. The verdict found the defendant guilty of "burglary and theft," and the court adjudged him guilty of "burglary and theft." *Quære*, whether this conviction for two distinct offences under one indictment is warranted by the provisions of the Penal Code? See the opinion *in extenso* on the question.

2. CONTINUANCE. — Defendant and one B. were separately indicted for the same burglary, and the defendant being first placed on trial, B. became the principal witness against him, and testified to declarations made to him by the defendant, which fully inculpated the latter. The theory of the defence was that B., in order to exculpate himself, falsely testified to inculpate the defendant. In his testimony, B. stated that the defendant confided to him, immediately after the burglary, the place where the stolen property was concealed, and that he, B., without the defendant's knowledge, removed a portion of it to another place; and that when he, B., was taxed with the crime, he told these facts to his accusers. Defendant applied for a continuance, to obtain the testimony of an absent witness, who would, in regard to the statements so made by B., testify to the same effect as B. himself did. The court below refused the continuance, on the ground that, inasmuch as B. admitted the truth of the desired testimony, the absent witness was not material to the defence. But *held*, in view of the peculiar circumstances of the case, that the testimony of the absent witness may have been very material to the defendant, and that he was entitled to have the benefit of it from a source not amenable to the suspicion which attached to the State's witness B.

APPEAL from the District Court of Bell. Tried below before the Hon. L. C. ALEXANDER.

The evidence discloses that, on the night of the 5th of October, 1877, the jewelry store of Julius Tobler, in the town of Belton, Bell County, was entered, and a quantity of jewelry and some $335 in silver abstracted. Some days subsequent to the burglary, a pair of saddle-bags, identified as the property of the defendant, containing a number of the articles stolen, was found secreted in an oat-crib, on the premises of A. M. Hanna. A room in Hanna's house, occupied by one John Bonner, was searched, and pieces of paper in which the stolen money had been wrapped, and a coin, identified as part of the missing money, were found. The indictment and arrest of Bonner followed; and, upon statements made by Bonner inculpating this defendant, this indictment was presented, charging burglary and theft. The trial resulted in a verdict of guilty of burglary and theft, and the punishment was assessed by the jury at five years' confinement in the penitentiary.

The proprietor of the establishment testified that he was in the habit of carrying his store-key and his safe and post-office keys on a ring, and in one of his coat-pockets. On the evening in question, about the usual hour of closing business houses, he locked up his safe and store, and went first to the post-office and got his mail, and then went to his residence, across a creek. When he retired that night, he left his coat either on a lounge or hat-rack standing in a hall, in which a light was kept burning all night. Witness heard no disturbance during the night himself, but his wife sat up in bed a few minutes, at one time, thinking she heard a slight noise. Early next morning, the witness's step-son went to the store, as usual, to sweep out and prepare for business. In a short time he returned, and told witness that he found the store open. On going to the store himself, the witness found the store-door open, with the key on the inside. The safe was open, and had been robbed. One fine watch worth $150, another worth $100, and a watch-case valued at $25, gold and silver chains, and over $300 depos-

ited by E. W. Corey for safe-keeping, were among the missing property.

The witness did not remember having seen the defendant about his store for several weeks, and had never seen him about his residence at all. Bonner frequently came about the store, and was there the evening of the robbery, before witness closed up. With the exception of one watch, the witness has recovered all of the property lost. He got the property from the foreman of the grand jury.

The substance of Dr. Manning's testimony was, that among the watches taken from the safe was one marked J. O. C., the property of his sister. When he heard of the robbery, he directed parties to look out for the watch, and also for rings marked J. T. When he heard that John Bonner was suspected, after the discovery of the saddle-bags and their contents in Maj. Hanna's crib, witness went with Mr. Corey to Austin, where Mr. Bonner then was. Bonner was found, and he told witness and Corey where part of the property was. The parties returned to Belton with Bonner, and on the morning after their return, witness, with the sheriff, took Bonner to Maj. Hanna's residence. He (Bonner) jumped the fence, and, without difficulty in finding the place, dug up a tin can with some of the stolen jewelry in it. He found it about the place indicated by him in a diagram drawn in Austin, and said nothing about any other jewelry in the saddle-bags.

The testimony of John S. Bonner is very lengthy, going into the minutest details of his knowledge of the robbery. The substance of it is, that for some months he had been an inmate of Maj. A. M. Hanna's residence. On the night of the robbery he returned to his room from a ball, and went to bed about eleven o'clock. Some time after he had been to sleep, the defendant came to his window and awakened him. He told the witness, there and then, that he had some thing to tell him, if he would promise not to tell. The witness promised that he would not tell of his own accord. Defendant then told witness that he had

" gone through old Tobler, that night, for all that he was worth." He held up a pair of saddle-bags, and showed witness a large amount of jewelry, that glistened, and also a sack, in which he said he had at least a thousand dollars. He asked the witness to assist him in secreting and preserving it, offering to give him one-half of the jewelry and money. Witness declined to have any thing to do with it. The defendant finally left. On the next night the defendant came back, and renewed his importunities for witness to share the plunder with him. Witness had learned that Mrs. Tobler's watch was among those stolen. He had, during the day, extracted that watch from the other plunder, having been told by defendant where he would secrete it. The defendant did not know that witness had taken out the watch. Witness asked defendant to let him have Mrs. Tobler's watch, proposing to send it back to her in such manner that she would not suspect the source of its restoration. Defendant agreed, provided witness would accept some of the plunder, in order to implicate himself to such extent that defendant would not be afraid of his exposure through the witness. The witness declined, and the defendant then rejected witness's proposition to restore Mrs. Tobler's watch. Such of the jewelry as witness had taken from the saddle-bags he put in an oyster-can, and buried it where he took it up when brought back to Belton. It was the witness's purpose to shelter the defendant as long as he could.

Some days after the robbery, witness left Belton, going to Austin with the Belton band, to play at the fair. Had been somewhat in arrears with his board, and having obtained some money from his father, and some from a negro, he paid Maj. Hanna some amount on his board. When approached in Austin about the robbery, he first denied any knowledge of it; his purpose, as stated, being to shield the defendant. Finally, however, he told how it occurred, or just what he knew of it, just as he tells it now.

When defendant got back to Belton from some point to

which he had gone, and after witness was thrown in jail, he asked Mr. Rather, the jailer, to send for defendant to come to see him in jail, and tried to get Rather and some others to secrete themselves so as to overhear their conversation. Defendant came, but witness could get no one to hide in order to hear what might be said. The material part of the rest of this witness's testimony is to the effect that, through others, he sought various appointments with defendant, after witness had been released on bond. Two or more of these meetings were effected, one of them under a vine-sheltered tree, in which one Ray had hidden in order to overhear what might be said. They conducted their conversation in plain hearing of Ray, and not over twelve feet distant from him. The defendant begged witness to " skip " his bond, saying that every body believed him guilty, and he might as well be guilty, — that all thought witness was a thief. He said that if witness would " skip " his bond, he (defendant) would stand his trial, come clear, and join witness at any designated place, when the two would go regularly into the robbery business, and get rich. He suggested a plan to rob P. J. Willis & Bros., of Galveston; also proposed to rob Col. Robertson's store at Salado. He told witness also, at this time, that if old Tobler had awakened and recognized him, when he went to his house and stole his keys from his pockets, he would have shot him. Witness then asked him if he thought he (witness) had taken the jewelry out of the saddle-bags and buried it with any intention to appropriate it to his own use. He answered, " No, John; you were too honest for that. I offered you half at first; and you might have had all, and I could have done nothing but waylaid and killed you." Witness also stated that he got some money from his mother on his way to Austin. This statement comprises all that was material in the lengthy evidence of this witness.

E. L. Aiken testified that he, at Bonner's request, made an engagement with defendant to meet Bonner, about the

last of August or first of September, 1878. The meeting took place at about nine o'clock, in an open prairie near Rather's Grove, in the northern part of the town of Belton. Witness and Bonner walked out there together, and met defendant, when defendant and Bonner walked off from witness about fifty yards, and had a long talk, which witness did not hear. This was one of the interviews spoken of by Bonner. Subsequently, about the 4th or 5th of September, 1878, witness made another engagement with defendant to meet Bonner at the forks of the road, south of town. Witness made the agreement with defendant at the court-house, in the evening. At supper that night he saw defendant again. He had come to the restaurant to get ice for Mr. Brown, who was sick in the court-house yard. Witness asked him if he was going to meet Bonner. He said no, that he " could not go." Witness does not know whether he went or not. Bonner did not tell witness that he would have a witness up the tree to listen. Neither one of the parties asked witness to go and hear what was said. This refers to the meeting at which the conversation between defendant and Bonner took place, as detailed by Bonner.

Richard Ray testified that, at Bonner's request, he took up his position one night in a vine-sheltered tree near the forks of the road, south of town, in order to overhear what should pass at an interview between Bonner and defendant. Bonner left the witness in the tree, and went down towards the forks. Presently he and defendant returned, and sat down under the tree, within twelve feet of witness. Defendant said that Brown was sick, and he must hurry back. Witness could have placed his hand on defendant's head as he passed under the tree, and is certain it was him. The conversation that transpired was detailed substantially as related by Bonner.

E. B. Miller testified that he was waiting on Bedford Brown, who was sick in the court-house yard, on the night of the 4th of September, 1878. The defendant and an-

other were present.   Defendant said he had an engagement
to meet some parties between nine and ten o'clock, and
asked witness to remain with Brown in his place.   He went
off, and remained away about an hour and a half.   During
his absence Brown was removed into the court-house.
Before he left, either he or some one else went after ice for
Brown.   Witness thinks it was defendant who went after
the ice.

A. M. Hanna deposed that, some days after the burglary,
he found a pair of saddle-bags in his crib, while removing
some oats.   The saddle-bags contained watches and jewelry.
The grand jury was at that time in session, and the wit-
ness delivered the saddle-bags and contents to the foreman.

John Bonner had been boarding at witness's house for
several months at the time of the burglary, and was in
debt to the witness at that time for perhaps six weeks'
board.   His custom was to pay up at the end of each
month, but his father had told witness that he might not be
able to pay at the end of that month, and witness had
agreed to let it run.   On the next day after the burglary,
Bonner paid witness what he owed him on his board.   The
witness was having a settlement with Capt. Thompson, and
went in his wife's room to get some change.   Bonner was
lying on the lounge, and handed him $25, saying that he
had the money then, and as he was going to the fair at
Austin, he had best pay it, as he might spend it.   The wit-
ness thinks this was on the next Sunday after the burglary.
Bonner had gone to Austin, and was there when the saddle-
bags were found by the witness.   Bonner left, witness
thinks, on the Monday after the burglary.

After the saddle-bags were found, Bonner's room was
searched, and a small lantern, covered with paper that had
a small hole in it, was found.   By placing the hand over
the hole, a " dark lantern " could be made of it.   The wit-
ness had never seen it before, but witness's wife and daugh-
ter told him that it had been there a month.   A coin

was also found in Bonner's trunk, which was claimed by Corey as part of the money he had deposited in Tobler's safe, and which was stolen. Pieces of paper were also found, in which Corey said his money was wrapped when deposited.

Witness, with others, visited Bonner while in jail. He took him off to one side and asked him to tell him (witness) the truth. He made the same statement he made before the court on this trial, except that he said nothing about the proposed "divide." The witness corrects his first statement, and says that it was the second Monday after the burglary that Bonner went to Austin, and more than a week after the burglary that he paid witness the $25.

Dudley Bean testified that the Belton fair commenced on Tuesday, October 2, 1877, and closed Saturday, October 6th. He saw the defendant get on the train at Round Rock, on the Monday before the fair, and start for Austin. Did not see him with a horse or saddle-bags at Round Rock.

Tom Minor, a barber at Round Rock, testified that he blacked defendant's hair in Round Rock, some time between the first of September and the last of October, but is unable to fix the date. Defendant had a pair of saddle-bags which looked like those produced, but witness cannot swear that these are the same.

Felix Cummings, Julius Tobler's step-son, corroborated the testimony of the latter.

E. W. Corey, for the defence, testified that he had $335 deposited in Tobler's safe when it was robbed, mostly in silver quarters and halves. When he learned that the saddle-bags and jewelry had been found on Maj. Hanna's place, and that Bonner boarded there, he got out a search-warrant and had Bonner's room searched. The lantern described by Maj. Hanna was found; also an English quar-ter, which he recognized as one of the pieces deposited with Tobler by him. The search also discovered some pieces of paper in which the money was wrapped when deposited.

One piece was from a price-list of a St. Louis boot and shoe house, and another from a stove and tinware establishment. Witness's money was wrapped in paper torn from these pamphlets. Thinking this sufficient evidence, witness got out a warrant for Bonner's arrest, and, with Dr. Manning, went to Austin after him. They took the city marshal of Austin with them, and found Bonner in bed in his room at an Austin boarding-house. When witness and the others went in, Bonner went to his valise, got out his pistol, and after examining to see if it was in shooting condition, he laid it on the bed. When asked about the robbery, he denied knowing any thing about it. When told about the saddle-bags being found, he appeared startled, and asked who found them. . Witness then told him that he had found some of the paper in which the money was wrapped, in his room, and he said some scoundrel had put it there. Bonner afterwards told witness and Manning, in the presence of the city marshal of Austin, where some of the jewelry was buried, in a tin can, in Maj. Hanna's garden. He drew a diagram, and located it near the twenty-fifth post. He denied taking witness's money; and witness told him he need not deny it, as he (witness) had the papers in his pocket.

Bonner repeated that he did not take the money, but asked witness if he would be satisfied if he got the money back. Witness answered that he would be pretty well satisfied, but that he would not compromise the law, and that he had money in lieu of that lost. Bonner's brother-in-law, Coffield, paid witness $295, and Bonner's father gave him his note for the balance. Bonner telegraphed to Coffield at Rockdale : "I am in trouble. Come quick. Bring money." Witness thinks Coffield saw Bonner before he paid him the $295.

Cross-examined, this witness said that the only evidence that the coin found in Bonner's room was his, was that he had one just like it in the amount stolen. There were

others like it in circulation, and the witness supposes that other merchants receive the same pamphlets he did, as advertising sheets. He thinks that when Bonner took his pistol out of the valise, he got out some clothing to put on. He told the witness and Manning that some body handed him the jewelry through a window, but did not at first name the party. When they reached the neighborhood of Round Rock, he told them it was the defendant who handed it to him through the window. He never did confess that he got any of the money.

Peter J. Rucker testified, for the defendant, that the Belton fair began on the second day of October, 1877; that Tobler's store was burglarized on the Friday night of the same week. On the second Monday after the burglary, and while the Austin fair was in progress, witness and Bonner went to Austin together, in a buggy. After leaving Belton, Bonner said that he had no pocket-book, and requested witness to carry some money for him, and gave him about $75 in greenbacks. They stopped at the house of Bonner's father *en route*, and Bonner went into an adjoining room. Witness presently heard a sound as of pouring silver money into a receptacle of some kind, and Bonner afterwards told him that he had left some money with his mother, — that he usually left his loose change with her. Between Belton and Salado the two met several parties who had guns in scabbards. Bonner seemed agitated when they met these men, and, taking out his pistol and placing it convenient for use, said, " Suppose they should attempt to rob us?" Witness observed no unusual demonstration on the part of these men.

After reaching Austin and taking a room, Bonner suggested that it would be unsafe to leave money about the room, and said that he had some silver in his valise. The two went out to hunt up a place to deposit it, and selected a reliable saloon. Witness and Bonner each put his silver money in a glass tumbler, and sealed it. On the

way to Austin, Bonner told witness that he had some $250 in silver. Witness afterwards deposited some money for Bonner with an Austin merchant, at his (Bonner's) request, and, after his arrest, gave an order on the merchant in favor of E. W. Corey. He did this at the request of Coffield, the brother-in-law of Bonner, Bonner assenting to it.

F. W. Robertson, Sr., father of the defendant, testified that, on the Monday after the robbery, he met John Bonner on the streets of Belton, when he told witness that this defendant had gone, and had left his saddle-bags and a pistol with him as a memento, but that witness could get them if he wanted them.

The defendant left Belton, for Hill County, on the Saturday before the Belton fair began. After Bonner came back from Austin, and charged the robbery on defendant, witness wrote to defendant at Hillsboro, and started himself after him. Witness met the defendant in the stage, between Waco and Hillsboro. He returned of his own free will. The saddle-bags exhibited on the stand by Maj. Hanna belong to the defendant.

Cross-examined, the witness said that though his son, the defendant, left on the Saturday to go to Hillsboro, he has learned since that he did not go there. Does not know that he took with him a pair of saddle-bags, or clothing. Does not know that defendant had more than one pair of saddle-bags, — the pair exhibited. "There is a bug under the chip about those saddle-bags." Witness met Bonner at the court-house in Belton, after he was released on bond, and had a conversation with him, during the course of which he (witness) told him that he "need not try to get out of this thing by implicating" the defendant; that he "thought he (Bonner) had better leave the country." Witness did tell him that if he would skip his bond he (witness) would pay half of it. He told Bonner this because he was sorry for his old father, whom he always liked, and who had always been his friend; and, besides,

witness owed his father a little. The witness does not remember that he told Bob Wright, when he got back from Hillsboro, that he had the papers to prove that defendant was in Hillsboro on the night of the robbery. Witness had heard that Wright claimed to have seen defendant in Belton on that night, and went to see him about it. Does not recollect what he said to Wright.

Susan Robertson, the mother, and Anna Robertson, the sister of defendant, testified that the defendant left home on Sunday before the fair. On the next day John Bonner was at the house, and said that defendant had left his saddle-bags and pistol with him as a memento.

Eugene Batte testified that, about one month before the robbery, when at a writing-school, on a very dark night, he loaned John Bonner a lantern. Had asked for it often, but it had not been returned. It was the same lantern said to have been found in Bonner's room at Maj. Hanna's. When recovered, it had paper around it, with a hole in it. Placing the hand over the hole would make a dark lantern.

Bob Wright, for the State, in rebuttal, testified that, after the robbery, old man Robertson told him that he had been to Hillsboro, and could prove that his son was there the night of the robbery. Witness does not remember that he said he had the papers fixed to prove it. Witness saw a man here during the fair, and, he thinks, on the fifth day of October, whom he took to be defendant, but cannot swear that it was.

Robert Bigham, for the State, in rebuttal, testified that, a short time previous to the robbery, defendant's father moved out of the house into which witness moved. On the Sunday previous to the fair, the defendant came to the house and got a pistol, and, the witness thinks, a pair of saddle-bags, out of an old trunk. Is not certain, however, whether he got the saddle-bags there or brought them with him, but is certain that he carried them off. Here the evidence closed.

The substance of the facts set out in the defendant's application for a continuance, and which he alleged he could prove by Ed Creary, upon whose absence was based his application, was that J. S. Bonner confessed to him (Creary), in the city of Austin, that he (Bonner) knew where the property stolen from Tobler's store was secreted; that Bonner, on a day prior to the finding of the indictment against the defendant, exhibited to the said Creary a diagram of the premises in Belton upon which he said the stolen property was secreted, and where in fact it was afterwards found.

*Willson & Gaines*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, J.   Appellant was indicted for burglary and the commission of theft after the burglarious entry.   He was convicted of "burglary and theft."   The verdict of the jury is: "We, the jury, find the defendant guilty of burglary and theft as charged, and assess his punishment at confinement in the State penitentiary for the term of five years;" and the judgment is: "It is therefore considered and adjudged by the court that the defendant, Felix W. Robertson, is guilty of burglary and theft as charged, as found by the verdict of the jury aforesaid, and it is ordered and adjudged," etc

Our statute provides that, "if a house be entered in such manner as that the entry comes within the definition of burglary, and the person guilty of such burglary shall, after so entering, commit theft, or any other offence, he shall be punishable for any felony so committed, as well as for the burglary."   Pasc. Dig., art. 2371.

And again: "If any person shall, after entering a house in any of the modes spoken of in this chapter, commit the offence of theft, he shall be punished by confinement in the penitentiary not less than two years, nor more than seven

years.'' Pasc. Dig., art. 2369. Punishment for simple burglary, in entering a house not a dwelling-house, is by confinement in the penitentiary not less than two, nor more than five years. Pasc. Dig., art. 2366.

As will be seen, two years are added when the burglary is aggravated by the further commission of theft. But the theft, though making a compound statute offence, is subordinate to, and forms but a part of, the main crime, which is burglary. The question is, whether, though the party may be punished for the two offences combined, he can be convicted, in the same judgment, of two distinct offences, to wit, burglary and theft?

We are led to suggest this question in consideration of the reasoning of our Supreme Court, in what appears to be a well-considered opinion, in the case of *Shepherd* v. *The State*, 42 Texas, 501. In that case the defendant was charged with burglary, and with theft after the burglarious entry. He was found guilty of burglary. Mr. Justice Devine, delivering the opinion, says: "The motion in arrest of judgment, with respect to the vague and uncertain character of the judgment, is answered by the clear and precise statement of the defendant's guilt as set forth in the indictment; and the alleged joinder of two separate and distinct felonies in the same count is not shown by an examination of the Code and the decisions of our own and other courts on similar questions. The indictment on its face shows that it charges an unlawful and burglarious entry, as set forth in art. 724 of the Criminal Code, and his liability to punishment for both the burglary and theft charged, under arts. 734, 735; and the indictment charges the entry, the felonious intent to steal, and the theft, with all the precision relating to time as expressed in art. 737. The charge of theft is included as one of the degrees of burglary. Art. 631 of the Code of Criminal Procedure, subdivision 4, treating of the different degrees of offences, says: 'Burglary, which includes every species of housebreaking and of theft

from a house.' There was no necessity, in this case, to charge an actual taking; the entry and intent would have been sufficient, but the charge as made is not open to objection. Mr. Bishop, in the second volume on Criminal Law, 117, treating of burglary with intent to commit a felony, and the commission of the felony after entry, says: 'The common method is to blend the two forms in one, and charge both an intent to do and an actual doing; and this blending has been held to be good. In *The Commonwealth* v. *Tuck*, 20 Pick. 360, the question was raised which is presented in this case, and the court said: ' So in burglary, where the indictment charges a breaking and entry with an intent to steal, and *an actual* stealing (which is the common form), the jury may acquit of the burglary and convict of the larceny, but cannot convict of *the burglary and larceny* as two distinct offences. The latter is merged in the former, and they constitute but one offence.' And to the same effect is *West* v. *The State*, 35 Texas, 91; *Wilcox* v. *The State*, 31 Texas, 587." 42 Texas, 503, 504.

Without deciding whether the verdict and judgment in the case at bar, when considered in the light of these authorities, are unwarranted, we have felt it due that we should call the attention of the court to them, for its consideration or another trial.

We are of opinion that defendant was entitled to a continuance for the witness Creary. In overruling the application as to this witness, the court says the motion was overruled " because it does not appear from the record, nor is it shown by averment, that the testimony of said witness Creary is material; and be it further remembered that on the trial, Bonner, who testified as a witness, did not deny the facts which it was proposed to prove by Creary." Under the peculiar circumstances of this case, we think the proposed testimony was material. True, the witness Bonner did not deny what was expected to be proven; still, the witness Bonner stood in the attitude of a *particeps*

*criminis,* who was trying to throw the burden of the crime upon the defendant by turning State's evidence, whether any agreement to that effect, and as to his own immunity, had been made with the prosecution or not. That was the position he held with relation to the case; and, whatever may be said of his testimony and admissions, they should not be held binding upon the defendant, if it were in his power to show the same facts, or to contradict him, by evidence coming from a source not tainted with suspicion of corruption.

We are free to confess that, under the peculiar facts and circumstances as set forth in the statement of facts, we would also prefer to have the case further developed in the light of the additional testimony, which seems to be accessible.

Because the court erred in overruling the application for continuance as to the witness Creary, the judgment is reversed and the cause remanded.

*Reversed and remanded.*